UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

SUFFOLK REGIONAL OFF TRACK BETTING CORP.,

              Plaintiff,

vs.

THE UNITED STATES SMALL BUSINESS ADMINISTRATION; ISABEL CASILLAS GUZMAN, in her official capacity as Administrator of the United States Small Business Administration; and THE UNITED STATES OF AMERICA,

              Defendants.

**COMPLAINT**

Case No.

---

     Plaintiff, Suffolk Regional Off Track Betting Corporation ("SROTB" or "Plaintiff"), by and through its attorneys, Harris Beach PLLC, sues Defendants, the United States Small Business Administration (the "SBA"); Isabel Casillas Guzman ("Guzman"), in her official capacity as Administrator of the United States Small Business Administration (the "Administrator"); and the United States of America (the "United States"), and alleges as follows:

## INTRODUCTION

     1.    This action is necessary to seek judicial review and reversal of the erroneous and improper decisions issued by the SBA and its Office of Hearing and Appeals ("OHA"), which denied forgiveness of SBA Loan No. 2844438000 obtained by SROTB pursuant to the Payment Protection Program ("PPP").

## PARTIES, JURISDICTION, AND VENUE

     2.    At all times relevant herein, SROTB was and is one of five regional off track betting corporations ("OTBs") licensed to do business in the State of New York, with an office in Hauppauge, New York.

3.    At all times relevant herein, the SBA was and is an independent federal agency created and authorized under 15 U.S.C. § 633, et seq. The SBA administers the PPP.

4.    At all times relevant herein, and since March 17, 2021, Guzman has served as Administrator of the SBA and, as such, is the officer with final authority for administering the PPP within the SBA. She is sued in her official capacity only. Authority to sue the Administrator is granted by 15 U.S.C. § 634(b).

5.    The United States is named as a party because the actions complained of were taken by the United States through its officials or agencies, including the SBA and the Administrator. *See* 5 U.S.C. §§ 702, 703.

6.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 1361, and 2201, as well as 5 U.S.C. § 702.

7.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) and 5 U.S.C. § 703 because SROTB resides in this judicial district.

8.    Authority for judicial review of agency action is provided by 5 U.S.C. §§ 702, 703, and 704, as well as 13 C.F.R. § 134.1211(g).

9.    This Court has authority to issue SROTB appropriate declaratory and injunctive relief under 28 U.S.C. § 2202 as well as under its inherent authority.

10.    The SBA's review and denial of SROTB's appeal through OHA became final on September 5, 2024, 30 days after service of the OHA's Reconsideration Decision. *See* 13 C.F.R. § 134.1211(c)(3).

11.    The SBA's decision is appealable to this Court and SROTB is entitled to judicial review. *See* 13 C.F.R. § 134.1211(g) ("Final decisions may be appealed to the appropriate Federal district court only.").

## FACTUAL ALLEGATIONS

**I.    Background.**

12.    On or about December 31, 2019, a novel coronavirus ("COVID-19") was detected in Wuhan, China and reported to the World Health Organization ("WHO").

13.    On January 30, 2020, the WHO declared the outbreak of COVID-19 a "Public Health Emergency of International Concern."

14.    On March 11, 2020, the WHO declared the COVID-19 outbreak as a "global pandemic."

15.    On March 21, 2020, New York Governor Andrew Cuomo announced the signing of the "New York State on PAUSE" order (the "Order"), which, among other things, mandated that, as of March 22, 2020, all non-essential businesses must close in-office personnel functions.

16.    Subsequent to Governor Cuomo's announcement, on March 21, 2020, the number of non-essential businesses subject to the Order continued to grow, significantly hindering the ability of many non-essential businesses to efficiently continue operations.

17.    On March 27, 2020, in an effort to alleviate the economic devastation stemming from the outbreak of COVID-19, President Donald Trump signed into law H.R. 748 "Coronavirus Aid, Relief, and Economic Security Act" (the "CARES Act"), which provided approximately two trillion dollars in relief.

18.    Under the CARES Act, the SBA offered loans under the PPP program in an effort to assist small businesses and not-for-profit entities to help them keep their employees during the COVID-19 pandemic.

19.    Senator Marco Rubio, who was the Chairman of the United States Senate Committee on Small Business and Entrepreneurship in 2020, when the CARES Act was passed,

stated that the PPP program "was designed as an alternative for unemployment and to prevent unemployment."

20.     The express language of the CARES Act provides that "*any business concern . . . shall* be eligible to receive a covered loan" if it had fewer than 500 employees during a specified covered period. *See* 15 U.S.C. § 636(a)(36)(D)(i) (emphasis added).  The CARES Act did not provide any further limitations or qualifiers for an eligible business.

21.     On April 2, 2020, the SBA issued an interim final rule (the "First Interim Rule") relating to eligibility requirements for participation in the PPP. The First Interim Rule was subsequently published in the Federal Register on April 28, 2020. *See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 23450 Apr. 28, 2020 (to be codified at 13 C.F.R. pt. 120 and 121). The First Interim Rule stated that borrowers seeking PPP loans would be subject to the ineligibility criteria set forth in 13 C.F.R. 120.110, with the exception of the provision excluding non-profit businesses from loan eligibility – criteria developed in relation to the SBA's preexisting small business loan program.

22.     Excluding the provision relating to non-profit businesses, section 120.110 categorically excludes 15 types of businesses from loan eligibility that are not excluded by any provision in the CARES Act, including "[b]usinesses deriving more than one-third of gross annual revenue from legal gambling activities," 13 C.F.R. 120.110(g), and "government-owned entities (except for businesses owned or controlled by Native American tribe)," 13 C.F.R. 120.110(j).

23.     On April 20, 2020, the SBA issued a Third Interim Rule stating, among other things:

> [A legal gaming] business that is otherwise eligible for a PPP Loan is not rendered ineligible due to its receipt of legal gaming revenues if the existing standard in 13 CFR 120.110(g) is met *or* the following two conditions are satisfied: (a) The business's legal gaming revenue (net of payouts but not other expenses) did not

exceed $1 million in 2019; and (b) legal gaming revenue (net of payouts but not other expenses) comprised less than 50 percent of the business's total revenue in 2019. Businesses that received illegal gaming revenue are categorically ineligible. The Administrator, in consultation with the Secretary, believes this test appropriately balances the longstanding policy reasons for limiting lending to businesses primarily and substantially engaged in gaming activity with the policy aim of making the PPP Loan available to a broad segment of U.S. businesses and their employees.

85 Fed. Reg. 21747, 21751 (emphasis added). Under the standard in 13 C.F.R. 120.110(g), "businesses deriving more than one-third of gross annual revenue form legal gambling activities" would be ineligible for a PPP loan.

24.    On April 28, 2020, the SBA altered the rule relating to legal gaming businesses again, posting a new interim final rule, its fourth in the series.[1] *See* Business Loan Program Temporary Changes; Paycheck Protection Program—Requirements—Promissory Notes, Authorizations, Affiliation, and Eligibility, 85 Fed. Reg. 23450 (Apr. 28, 2020) (to be codified at 13 C.F.R. pts. 120-21) (the "Fourth Interim Rule"). The Fourth Interim Rule provided that a gaming institution's receipt of legal gaming revenues did not render the gaming institution ineligible for PPP loan forgiveness, and states as follows: "A business that is otherwise eligible for a PPP loan is not rendered ineligible due to its receipt of legal gaming revenues, and 13 C.F.R. 120.110(g) is inapplicable to PPP loans." *Id.*

25.    In announcing this further expansion in PPP eligibility for gaming institutions through the Fourth Interim Rule, the SBA explained that "this approach is more consistent with the policy aim of making PPP loans available to a broad segment of U.S. businesses." *Id.*

---

[1] The SBA previously had issued second and third interim final rules. *See* Business Loan Program Temporary Changes: Paycheck Protection Program, 85 Fed. Reg. 20817 (Apr. 15. 2020) (to be codified at 13 C.F.R. pt. 121); Business Loan Program Temporary Changes; Paycheck Protection Program—Additional Eligibility Criteria and Requirements for Certain Pledges of Loans, 85 Fed. Reg. 21747 (Apr. 20, 2020) (to be codified at 13 C.F.R. pt. 120).

26.    Likewise, in the Fourth Interim Rule, the SBA relaxed the ineligibility rule for government-owned entities, explaining that:

> A [governmentally owned] hospital that is otherwise eligible to receive a PPP loan as a business concern or nonprofit organization (described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from taxation under section 501(a) of such Code) shall not be rendered ineligible for a PPP loan due to ownership by a state or local government if the hospital *receives less than 50% of its funding from state or local government sources* . . . . The Administrator, in consultation with the Secretary, determined that this *exception to the general ineligibility of government-owned entities*, 13 C.F.R. § 120.110(j), is appropriate to effectuate the purposes of the CARES Act.

*Id.* at 23451 (emphasis added).

27.    In stating that this expansion in PPP eligibility to governmentally owned hospitals and nonprofit organizations comports with the "purposes of the CARES Act," the Fourth Interim Rule goes on to explain that the purpose behind the enactment of "[t]he CARES Act was . . . to provide immediate assistance to individuals, families, and organizations affected by the COVID-19 emergency." *Id.* at 23450-51.

28.    On December 27, 2020, the Economic Aid to Hard-Hit Small Businesses, Nonprofits and Venues Act (Pub. L. 116-260) was enacted to extend the PPP and authorize the SBA to guarantee additional PPP loans to eligible borrowers (the second draw PPP program).

29.    On March 30, 2021, the PPP Extension Act of 2021 extended the SBA's authority to guarantee PPP loans through June 30, 2021.

30.    On September 16, 2021, the SBA issued an interim final rule ("IFR") outlining the procedures for PPP borrowers and PPP lenders to process a PPP borrower's administrative appeal of certain SBA PPP loan review decisions ("SBA Loan Review Decisions") to the OHA. The IFR applies to all appealable final SBA Loan Review Decisions, including all appeals filed after the

effective date of September 14, 2021, and appeals filed before the effective date for which a Notice and Order has not been issued.

**II.     SROTB was eligible for a PPP loan under the CARES Act, which extended funding, "in addition to small business concerns, [to] any business concern, nonprofit organization, veterans organization, or Tribal business concern . . . [that, as relevant here,] employs not more than 500 employees . . ." 15 U.S.C. § 636(a)(36)(D).**

31.     SROTB is a public benefit corporation that operates a legal gaming business at entertainment venues in Suffolk County. SROTB has an exclusive license to operate off-track Pari-mutuel betting throughout Suffolk County, New York. Pari-mutuel betting is defined as "a system of wagering on races whereby the winners divide the total amount wagered, after deducting management expenses, in proportion to the sums winners wagered individually."

32.     In addition, SROTB generates Pari-mutuel revenue at a number of "QWIK Bet" locations by placing Pari-mutuel wagering equipment at a network of third-party retailer locations; it maintains an internet Pari-mutuel wagering platform called "QWIKbetz.com"; and it offers telephone wagering on horse-races, known as "Tel-a-Bet."

33.     SROTB's video lottery gaming business is conducted within Jake's 58 Casino Hotel, where it operates 1,000 video lottery terminals ("VLTs").

34.     As discussed, SROTB's Pari-mutuel business operations provide entertainment to the general public.

35.     SROTB directly competes against other commercial businesses and casinos seeking market share for customers and hospitality revenues.

36.     SROTB is governed by an independent Board of Directors (the "SROTB Board"). While board members are appointed by the Suffolk County Legislature, the SROTB Board functions as an independent body and provides the typical corporate oversight, separate from the State and Suffolk County. SROTB secures its own loans and financing and neither the State nor

the participating municipality, Suffolk County, hold any liens or provide credit to support the financing.

37.    SROTB does not receive any government funding. SROTB cannot incur or impose debt, liability, or obligation on the State or Suffolk County and vice versa. Like all other VLT operators in the marketplace, SROTB makes VLT revenue/tax payments to the State each business day. In addition, SROTB values philanthropy as part of its corporate culture. The corporation has an annual budget of $120,000 to donate to community charities and its employees also volunteer at local charities. Just recently, SROTB employees helped clean up a nearby veteran's hall and restored a local food pantry garden.

38.    Customer revenue is the sole source of SROTB's income and when the unprecedented COVID-19 pandemic related complete and partial closures were imposed, SROTB lost its sole source of income. SROTB does not have the authority to tax nor receive monies from any governmental sources and it is solely responsible for the payment of expenses and debts that it incurs.

39.    Neither the State nor any political subdivision thereof have any ownership or fiscal responsibility for SROTB. Pursuant to State law, SROTB is a public benefit corporation that is a distinctly separate entity from the State and Suffolk County.

**III.    SROTB applied for a PPP loan, and detrimentally relied on the approval of the Loan and distribution of the Loan's proceeds.**

40.    Due to the COVID-19 pandemic related operating restrictions, SROTB incurred significant financial losses in 2020 as a result of the impact of the total or partial closure of its operations.

41.     In the wake of the COVID-19 pandemic related total closure of businesses in March 2020, SROTB was faced with a difficult decision. As businesses were mandated to close and SROTB's revenues ceased, SROTB had to decide how to avoid a mass lay off and shutter its doors.

42.     With no customer revenues coming in and no inclination of when the government would allow it to reopen, SROTB, instead of laying off employees, furloughed non-essential team members. However, SROTB continued to provide health coverage for all furloughed members.

43.     With cash reserves near depletion, the PPP program was a lifeline for SROTB.

44.     On or about June 19, 2020 after the Fourth Interim Rule was promulgated, SROTB executed the Payment Protection Program Borrower application form (the "SROTB PPP Application"), and applied to the SBA for a loan in the amount of $3,978,827.00. A true and accurate copy of the SROTB PPP Application is filed herewith as **Exhibit 1**. Although the PPP loan program was later extended, this was a first draw PPP loan.

45.     As a small entertainment business with fewer than 500 employees, SROTB operated under the good faith belief that SROTB was eligible for a PPP loan, that the proceeds that SROTB received from its PPP loan could be used for its intended purpose to pay for and retain its employees and such loan would be forgiven as long as the proceeds were used as required by the PPP program—a view shared by all other OTBs in the State, all of which also received PPP loans and which loans were subsequently forgiven.

46.     Had SROTB been informed at the outset, when it submitted the SROTB PPP Application, that SBA regarded SROTB as ineligible to receive a PPP loan in the first place, and had the SBA rejected the SROTB PPP Application accordingly, SROTB would have changed course and would have had no choice but to lay off hundreds of employees and cease health insurance coverage.

47.     However, SBA neither denied the SROTB PPP Application, nor advised SROTB that SBA regarded SROTB as ineligible to receive a PPP loan.

48.     Instead, on or about July 21, 2020, the SROTB PPP Application was approved for Loan No. 2844438000, and SROTB received PPP loan proceeds for the full amount it had applied for—$3,978,827.00 (the "Loan").

49.     In reliance on the SBA's approval of the SROTB PPP Application, SROTB fully utilized the proceeds from the Loan that it received to pay the salaries of its essential employees and cover health insurance for its furloughed employees during the closure period.

50.     SROTB would not have been able to do so had SBA not approved the SROTB PPP Application. Indeed, the PPP loan was a lifeline in that regard, without which hundreds of individuals in SROTB's employ would have been laid off and would have had to file for unemployment.

51.     The proceeds from the PPP loan also permitted SROTB to quickly operate at increasing capacity as governmental closure restrictions loosened. Without the PPP loan, layoffs would have been unavoidable and, as restrictions were gradually lifted, SROTB would have had to hire new employees to re-open its various entertainment operations. Each of those new employees would have had to obtain the appropriate employee gaming license from the New York State Gaming Commission, which during the COVID pandemic era was taking anywhere from four to six weeks for review and approval.

52.     On September 9, 2020, the VLT facility at Jake's 58 Casino Hotel was able to reopen at 25% capacity. However, SROTB was not allowed to reopen its off-track betting operations for its customers.

53.     Thereafter, SROTB's VLT facility at Jake's 58 Casino Hotel opened with varying restrictions on capacity and hours of operation until June 16, 2021.

54.     In early April 2021, the restrictions on hours of operation were lifted and on May 15, 2021, the permitted capacity was increased from 25% to 50%.

55.     On June 16, 2021, SROTB was able to open all its VLT and off-track betting operations at full capacity.

56.     If not for the PPP loan, SROTB would not have been in a position to re-open and staff its operations appropriately during the phased re-opening schedule mandated by the State from September 9, 2020 to June 16, 2021.

57.     As a small business entirely dependent on revenue generated by customer use of its entertainment facilities, SROTB had no ability to raise revenue to pay employees when its gaming and hospitality business was closed by government mandate.

58.     The PPP loan allowed SROTB to have employees available to work during the partial re-opening phases implemented by the State until it was able to fully reopen 15 months after the initial complete closure of operations.

59.     Without the PPP loan, SROTB would not have been able to reopen on the dates specified by the State.

60.     Without the PPP loan, rehiring and/or hiring new employees, training them, and obtaining the requisite employee gaming licenses from the New York State Gaming Commission could have taken weeks if not months, and thus, put SROTB at a significant competitive disadvantage as compared to its gaming, hospitality, and entertainment competitors in its market who received PPP loans.

**IV.    The SBA wrongfully denied SROTB forgiveness of the Loan.**

61.    On January 29, 2021, SROTB submitted a loan forgiveness application, which sought forgiveness of the Loan (the "Loan Forgiveness Application").

62.    On October 16, 2023, SROTB received a notice from the United States Department of the Treasury (the "DOT") indicating that the SBA had referred the unpaid Loan to the DOT for immediate collection and stating that SROTB owes the United States government $5,256,935.24 on the Loan.

63.    SROTB thereafter discovered that Community Federal Savings Bank ("Lender" or "Community Federal") failed in its responsibility to provide notice of the SBA Final Loan Review Decision, dated May 22, 2023 (the "FLRD"), to a valid working e-mail address at SROTB or to any other address at SROTB until October 18, 2023. Community Federal presumably received an error message that alerted Community Federal that its email was sent to a non-existent email address, but Community Federal took no further action to ensure that SROTB received notice of the FLRD.

64.    The FLRD was not otherwise communicated to SROTB by Community Federal or the SBA prior to SROTB's inquiry to Community Federal on October 16, 2023.

65.    Community Federal has also failed to provide the other important notifications required by the FLRD, which to this day Community Federal has still not provided to SROTB, including failing to provide SROTB with a re-payment schedule.

66.    The FLRD issued by SBA concludes that SROTB's organization structure is ineligible for loan forgiveness under C.F.R. §120.110(j). A true and accurate copy of the FLRD is filed herewith as **Exhibit 2**.

## V.    The OHA wrongfully denied SROTB's appeal of the FLRD.

67.    On November 14, 2023, SROTB filed a PPP appeal petition, with exhibits, to the OHA (the "Appeal Petition").[2] A true and accurate copy of the Appeal Petition is filed herewith as **Exhibit 3**.

68.    On December 11, 2023, Administrative Law Judge Kenneth M. Hyde (the "Administrative Law Judge") issued a Notice and Order that, among other things: (i) required the SBA to file the administrative record containing "every non-privileged document relevant to [SROTB's] PPP loan that SBA processed on the date of its final loan review decision" no later than January 2, 2024; (ii) ordered SROTB to file and serve any objections to the absence of any document in the administrative record on or about January 12, 2024; and (iii) granted the SBA permission to respond to the appeal no later than January 25, 2024. A true and accurate copy of the Notice and Order is filed herewith as **Exhibit 4**.

69.    On December 26, 2023, the SBA filed the administrative record, as well as a supplement to the administrative record to include an exhibit that had been omitted due to file size. A true and accurate copy of the administrative record (the "Administrative Record") is filed herewith as **Exhibit 5**.

70.    On January 10, 2024, SROTB timely objected to the Administrative Record. A true and accurate copy of SROTB's objection to the Administrative Record is filed herewith as **Exhibit 6**.

---

[2] On November 16, 2023, the Administrative Law Judge ordered SROTB to show cause why the Appeal Petition should not be dismissed as untimely (the "OTSC"). A true and accurate copy of the OTSC is filed herewith as **Exhibit 10**. On November 27, 2023, SROTB filed a memorandum of law, with supporting affidavits and exhibits, which responded to the OTSC. A true and accurate copy of SROTB's response to the OTSC with exhibits is filed herewith as **Exhibit 11**. On December 11, 2023, the Administrative Law Judge issued a Notice and Order, which determined that the appeal had been timely filed in accordance with applicable regulations.

71.    On February 12, 2024, the SBA responded to SROTB's appeal and objections to the Administrative Record.

72.    On April 2, 2024, the Administrative Law Judge issued a decision denying SROTB's appeal and affirming the FLRD's denial of forgiveness of the Loan (the "OHA Initial Decision"). A true and accurate copy of the OHA Initial Decision is filed herewith as **Exhibit 7**.

73.    In the OHA Initial Decision, the Administrative Law Judge recognized that SROTB timely submitted its appeal; rejected SROTB's objections to the Administrative Record proffered by SBA; concluded that the SBA did not err in determining that SROTB was ineligible for the PPP loan it received; and held that SROTB is not entitled to forgiveness of the Loan. *See* Exhibit 7.

74.    The OHA Initial Decision specifies that it is "the initial decision of the SBA," and that, "unless a request for reconsideration is filed under 13 C.F.R. § 134.1211(c), or unless the SBA Administrator elects to review [the OHA Initial Decision] pursuant to 13 C.F.R. § 134.1211(d), [the OHA Initial Decision] shall become the final decision of the SBA 30 calendar days after its service." Exhibit 7.

75.    On April 12, 2024, SROTB timely filed a petition for reconsideration. A true and accurate copy of SROTB's petition for reconsideration with exhibits is filed herewith as **Exhibit 8**.

76.    On August 6, 2024, the Administrative Law Judge issued an order denying SROTB's Petition for Reconsideration (the "OHA Final Decision"). A true and accurate copy of the OHA Final Decision is filed herewith as **Exhibit 9.**

**VI.    The FLRD, OHA Initial Decision, and OHA Final Decision arbitrarily, capriciously, and erroneously rely on improper regulatory authority, overlooking the actual governing rules.**

77.    The FLRD, OHA Initial Decision, and OHA Final Decision wrongfully concluded that SROTB is ineligible to have obtained a PPP loan, and therefore is not entitled to loan forgiveness, on the rationale that SROTB is a government-owned entity. *See* Exhibits 2, 7, and 9. The term "government-owned entity" does not appear in the CARES Act provisions governing first draw PPP loans.

78.    As discussed in the paragraphs above, although the PPP loan provisions of the CARES Act contain specific eligibility criteria, soon after its enactment the SBA issued its First Interim Rule purporting to apply its own pre-existing rules relating to loan eligibility found in 13 C.F.R. 120.110 – rules designed to apply in the entirely different context of pre-pandemic lending. By purporting to import all but one of the restrictions in 120.110, declaring 15 types of businesses/entities categorically ineligible, while the nation was in the grip of the acute phases of the crisis and related mandated closures, the SBA initiated a policy to significantly restrict the scope of the ameliorative legislation based on criteria that had no connection to the CARES Act or the extraordinary crisis it was adopted to redress.

79.    Among the types of businesses/entities initially declared ineligible by fiat based on the importation of 120.110 were, as relevant here, "[b]usinesses deriving more than one-third of gross annual revenue from legal gambling activities," 120.110(g), and "[g]overnment-owned entities (except for businesses owned or controlled by a Native American tribe)," 120.110(j). Perhaps realizing the lack of wisdom in this approach, the SBA soon issued a series of interim rules partially relaxing some of these inaptly applied criteria in a belated (and incomplete) attempt

to conform its implementation practices with the clear language of the statute and policy underlying the legislation.

80.    The SBA's wholesale importation of pre-existing regulatory ineligibility criteria to restrict the issuance/forgiveness of first draw PPP loans under the CARES Act during the most acute stage of the financial crisis brought on by the government mandated complete and later partial closures of businesses as a result of the pandemic was arbitrary, capricious, inconsistent with Congressional policy, and contrary to law under the Administrative Procedure Act, which precludes an agency from taking action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. 706(2)(C).

81.    In clear and unambiguous language, in a provision of the CARES Act entitled "Keeping American Workers Paid and Employed Act," Congress created the PPP – the "Paycheck Protection Program." The transparent Congressional intent was to make first draw PPP loans broadly available and to increase eligibility for these emergency business loans beyond the eligibility available under the pre-existing SBA program.

82.    The loan eligibility criteria appear in a section entitled "Increased Eligibility for Certain Small Businesses and Organizations" and broadly provide that, during the covered time-period, "*any* business concern, nonprofit organization, housing cooperative, veterans organization, or Tribal business concern . . . *shall* be eligible to receive a covered loan if the business concern, nonprofit organization, housing cooperative, veterans organization, or Tribal business concern employs," as relevant here, "not more than . . . 500 employees." 15 U.S.C. 636(a)(36)(D)(i) (emphasis added).

83.    The criteria that a business must satisfy are expressly and unambiguously stated in the statute in both expansive and mandatory terms. By imposing 15 additional ineligibility criteria

that categorically precluded certain types of businesses from the benefits of the act, significantly restricting access to PPP borrowers that otherwise would be eligible under the plain language of the statute, the SBA exceeded its authority and acted contrary to law.

84.     While this issue has been litigated, the proper interpretation of the statute – and the scope of the SBA's authority to impose additional, restrictive eligibility criteria in relation to first draw PPP loans – has not been definitively resolved. To date, courts that have examined this issue have applied the analytical framework of *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984), which is no longer the governing standard following the U.S. Supreme Court's decision in *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024).

85.     Even applying the deferential *Chevron* framework, some courts have found that the SBA exceeded its authority when it imposed the additional disqualifying ineligibility criteria in 13 C.F.R. 120.110 to first draw PPP loans without clear legislative authorization. *DV Diamond Club of Flint, LLC v. Small Business Administration*, 960 F.3d 743 (6th Cir. 2020) (SBA application for stay pending appeal denied; "by specifying 'any business concern,' Congress made clear that the SBA's longstanding ineligibility rules are inapplicable [to first draw PPP loans], given the current circumstances"); *but see Pharaohs GC, Inc. v. United States Small Bus. Admin.*, 990 F.3d 217 (2d Cir. 2021) ("[T]he CARES Act unambiguously gives the Administrator discretion to adopt the longstanding 'terms, conditions and processes' of the 7(a) program, including the eligibility requirements of 120.110.").

86.     Upon de novo review of the statutory interpretation issue under the appropriate standard it is evident that the SBA's restrictive imposition of section 120.110 ineligibility criteria was inconsistent with the plain language of the CARES Act and the Congressional intent to create an expansive first draw PPP loan program to address the acute national crisis then in effect. Thus,

the "government-owned entities" ineligibility criteria in 13 C.F.R. 120.110(j) was inapplicable to SROTB's PPP loan and it was error to deny loan forgiveness on that basis.

87.     Alternatively, even if the SBA did not act in excess of its administrative authority when it imported the ineligibility provisions of 13 C.F.R. 120.110 into the first draw PPP loan program without Congressional authorization, the manner in which it applied the ineligibility criteria to SROTB was arbitrary, capricious, and contrary to law.

88.     The SBA erred in deeming SROTB ineligible for a PPP loan on the ground that SROTB is a "government-owned entity" and the OHA erred in upholding that determination. The term "government-owned entity" is undefined in the rule and the legal and/or factual basis of its application to SROTB is unexplained in the relevant administrative decisions. As a corporation with an independent board that functions independently of State and municipal government control other than typical regulatory oversight, receives no financial support and has no governmental powers, SROTB was not properly treated as a "government-owned entity" ineligible for relief under the PPP loan program; such determination was arbitrary, capricious and contrary to law. While the "government-owned entity" exclusion reasonably may be aimed at preventing entities supported by government funding from receiving small business loans, it should not have been applied to SROTB, which receives no financial support from any government source, including the State or local government.

89.     The specific purpose of the SROTB is to (i) promote the well-being of the horse racing and breeding industries in New York State, (ii) provide employment opportunities, (iii) curb illegal bookmaking by providing a legal and transparent wagering system, and (iv) provide a revenue stream to the government. SROTB does not regulate, tax, or supply state or municipal services and, in all respects relevant to the PPP loan, functions in the market as a legal gaming

business. As such, it was eligible for a PPP loan, even under the SBA's restrictive view of the program, based on the Fourth Interim Rule, which stated "13 C.F.R. 110.110(g) is inapplicable to PPP loans," and made legal gaming businesses eligible for PPP loans regardless of the percentage of revenues derived from gaming activities.

90.     Even if SROTB were properly classified as a "government-owned entity," the FLRD, OHA Initial Decision, and OHA Final Decision cite the initial rule for "government-owned entities" in the Code of Federal Regulations, 13 C.F.R. § 120.110(j), rather than the aforementioned revised rule (cited above) dated April 28, 2020, found in the Federal Register, 85 Fed. Reg. at 23450, which makes SROTB eligible for forgiveness. *See* Exhibits 2, 7, and 9.

91.     In so doing, in the FLRD, OHA Initial Decision, and OHA Final Decision, the SBA and OHA rely upon an older and outdated version of their own rules, instead of the revised guidance in the Federal Register that superseded the prior rules and expanded eligibility to make entities like SROTB, which does not receive any government funding, eligible for a PPP loan and corresponding PPP loan forgiveness.

92.     More specifically, in the more recent and clarifying guidance delineated in 85 Fed. Reg. at 23450, the SBA responded to an inquiry regarding whether a hospital owned by governmental entities is eligible for a PPP loan, and explained that a government-owned hospital that would otherwise be eligible to receive a PPP loan would not be considered ineligible if the hospital received less than fifty percent of its funding from government sources.

93.     In so stating, the SBA established an exception to the general ineligibility of government-owned entities under 13 C.F.R. § 120.110(j), thereby limiting ineligibility only to government-owned entities that receive more than fifty percent of funding from government

sources, and simultaneously expanding eligibility to government-owned entities that receive less than fifty percent of funding from government sources.

94.    The most likely explanation behind the SBA's eligibility guidelines is that the SBA sought to prevent businesses that already receive more than a majority of their annual budget from government funds from obtaining additional federal funding, thereby narrowing the "government-owned entity" ineligibility criteria in relation to first draw PPP loans.

95.    Here, the apparent policy underlying the exclusion of "government-owned entities" – to avoid providing federal fundings to entities already supported by government funding – are simply not present because SROTB receives no funding from any government sources.

96.    Moreover, the SBA's decision to expand eligibility and make entities like SROTB eligible for a first draw PPP loan and corresponding PPP loan forgiveness effectuates the very purpose of the CARES Act—to provide fast and direct economic assistance for American workers, families, small businesses, and industries during the acute phase of an unprecedented financial crisis brought on by the pandemic. *See* 85 Fed. Reg. 23450-51 (explaining that the purposes of the CARES Act "was . . . to provide immediate assistance to individuals, families, and organizations affected by the COVID-19 emergency").

**VII.    The FLRD, OHA Initial Decision, and OHA Final Decision arbitrarily, capriciously, erroneously, and without explanation deemed SROTB ineligible for loan forgiveness despite granting first draw PPP loan forgiveness to all similarly situated OTBs in New York State and across the United States of America.**

97.    The New York State Legislature, in 1973, created seven regional OTBs to administer off-track wagering and required them to pay a "state tax," a portion of which went to the regional harness tracks and nonprofit racing associations. *See* L. 1973, ch. 346, § 4, as amended.

98.    The intention of the Legislature was:

> to derive from such betting . . . a reasonable revenue for the support of government, and to prevent and curb unlawful bookmaking and illegal wagering on horse races. It is also the intention of this article to ensure that off-track betting is conducted in a manner compatible with the wellbeing of the horse racing and breeding industries in this state, which industries are and should continue to be major sources of revenue to state and local government and sources of employment for thousands of state residents.

Racing, Pari-Mutuel Wagering and Breeding Law § 518.

99.    Since its inception, SROTB has provided significant revenue to State and Suffolk County government, thereby relieving the tax burden of New York State residents.

100.    Currently, there are five regional OTBs remaining: SROTB, Nassau Regional Off Track Betting Corporation ("Nassau OTB"), Capital District Regional Off Track Betting Corporation ("Capital OTB"), Catskill Regional Off Track Betting Corporation ("Catskill OTB"), and Western Regional Off Track Betting Corporation ("Western OTB," and each a "NY OTB").

101.    Of these sister public benefit corporations, every NY OTB has been approved by the SBA for first draw PPP loans, received PPP loan proceeds, submitted forgiveness applications, had their forgiveness applications approved, and had their PPP loans forgiven in their entirety by the SBA, except SROTB. No explanation or basis for the SBA's disparate treatment of SROTB has been provided.

102.    The OHA Initial Decision states that "*two* of [SROTB's] sister corporations *may* have had PPP loans forgiven," and asserts in conclusory manner that this "is not compelling evidence of disparate treatment." Exhibit 7 at p. 8 (emphasis added). In fact, *all* of SROTB's sister corporations *did* have their PPP loans forgiven by the SBA.

103.    Further, SROTB has no distinguishable characteristics from every other NY OTB, and is similarly situated to all of them.

104.     The OHA Initial Decision acknowledges that SROTB has no distinguishable characteristics from every other NY OTB in recounting that SROTB has the same organizational structure as these other NY OTBs. *See* Exhibit 7 at p. 3-4.

105.     In response to the SBA and OHA's starkly disparate treatment of SROTB compared to other NY OTBs, the OHA Initial Decision and OHA Final Decision merely surmise that "forgiveness may have been mistakenly granted to other borrowers." Exhibits 7 and 9.

106.     In addition, upon information and belief, the SBA has granted forgiveness to other off-track betting and/or gaming entities throughout the United States, including but not limited to: Arizona Downs LLC; Downs at Albuquerque Inc.; Emerald Downs Racing LLC; Fonner Park Exposition and Events Center, Inc.; Hawthorne Race Course, Inc.; Kentucky Downs, LLC; Northern California Off Track Wagering Incorporated; Tampa Bay Downs; and Wyoming Horse Racing LLC.

107.     SBA seems to have been unaware of its disparate treatment of SROTB until that fact was called to its attention by SROTB, which suggests that no effort was made to review internal precedent prior to denial of SROTB's loan forgiveness application (as further explained below, internal loan administration materials indicate that the recommendation was to grant partial forgiveness, with no explanation provided to date as to why the agency changed course). Since the issuing of the OHA Final Decision, SBA's response has not been to correct this inequity or to explain its inconsistent administration of a $349 billion program, but instead SBA has attempted to claw back forgiveness previously granted to other NY OTBs.

108.     Inconsistent application of a statutory and regulatory regime is the epitome of arbitrariness and this alone is a basis to overturn the administrative determinations. While there are occasions when an agency may properly change course, it must acknowledge that it previously

took a different position and explain why it is adopting a new approach or reaching a different result. Put another way, an agency must "display awareness that it is changing position" and "show that there are good reasons for the new policy," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Neither occurred here.

**VIII.  The OHA Initial Decision and OHA Final Decision arbitrarily, capriciously, and erroneously rely upon an incomplete administrative record; OHA erred in denying SROTB's objections to the adequacy of the record.**

**A.    The Administrative Record lacks any documentation explaining SBA's disparate treatment of OTBs—every other OTB in New York has been granted a PPP loan and had its PPP loan forgiven.**

109.    The Administrative Record submitted by the SBA contains no documentation to explain the SBA's disparate treatment of SROTB from every other NY OTB. *See generally* Exhibit 5.

110.    The only documentation contained within the Administrative Record that pertains to other NY OTBs is the executive summary generated by the Office of the New York State Comptroller (the "Executive Summary"). *See* Exhibit 5 at pp. 568-82.

111.    The Executive Summary consists of an audit that was conducted to assess the financial condition of the NY OTBs for the period January 1, 2009, through August 31, 2014. *See* Exhibit 5 at pp. 568-82. The Executive Summary states that all NY OTBs were created by legislation as public benefit corporations, and that each is governed by a Board of Directors whose members are appointed by the governing bodies of the relevant local governments. *See* Exhibit 5 at p. 568.

112.    While the Executive Summary fails to explain the SBA's disparate treatment of the NY OTBs, it does serve as further proof that there exists no distinction between the organizational

structure of SROTB and the other NY OTBs, as all NY OTBs are public benefit corporations engaged in legal gaming businesses.

113.    The SBA has provided no documentation in the Administrative Record to explain why the SBA granted PPP loans and PPP loan forgiveness to Capital OTB, Western OTB, Nassau OTB, and Catskill OTB (all of the other four existing NY OTBs), but denied forgiveness to SROTB. *See generally* Exhibit 5.

114.    Further, the Administrative Record fails to reveal how SROTB differs from other NY OTBs in any relevant respect that would justify the determination that SROTB is ineligible for a PPP loan and ineligible for forgiveness, while the SBA has determined that all of the other NY OTBs are eligible for PPP loans and eligible for forgiveness. *See generally* Exhibit 5.

115.    In the OHA proceeding, SROTB filed an objection to the Administrative Record as incomplete, as the SBA failed to provide documentation explaining how the SBA arrived at the conclusion that SROTB was an ineligible organizational structure that should be denied forgiveness, while granting forgiveness to all other OTBs, which the Administrative Record confirms has the same organizational structure as SROTB. The Administrative Law Judge issued a ruling denying SROTB's requests for this additional and relevant information that was necessary for their decision.

116.    The Administrative Law Judge's decision was determined on an incomplete and erroneous record. Therefore, any decision rendered by the Administrative Law Judge by definition is arbitrary and capacious as the decision was based on partial evidence.

**B. Partial forgiveness was recommended, but no documentation was provided explaining why the recommendations for partial forgiveness were not followed.**

117. On at least four separate occasions within the Administrative Record, the SBA concluded that SROTB was, in fact, eligible for forgiveness and/or approved for forgiveness. *See* Exhibit 5.

118. <u>First</u>, in the SBA review summary contained in the Administrative Record, SROTB's eligibility for forgiveness was reviewed and SROTB was found to have satisfied each and every requirement for forgiveness. *See* Exhibit 5 at pp. 6-12.

119. Notably, SROTB's organizational structure was specifically found to be eligible for forgiveness. *See* Exhibit 5 at p. 6.

120. Further, SROTB was determined to be eligible under 13 C.F.R. § 120.110, and found not to have an ineligible business requiring denial of forgiveness. *See* Exhibit 5 at p. 8.

121. <u>Second</u>, in SBA's internal notes, Angela McManus evaluated whether SROTB was eligible for forgiveness and commented on September 8, 2021:

> There are no hold flags. The borrower meets eligibility requirements . . . . Required SBA forms . . . were reviewed and determined to be in compliance. The amount of forgiveness applied for is $3,978,827 and the maximum loan calculation is $3,498,625 . . . . Additional documents were provided and reviewed that further supported the application requirements for forgiveness . . . .

*See* Exhibit 5 at p. 19; *see also* Exhibit 6. Ms. McManus concluded that "[p]artial forgiveness in the amount of $3,498,624 is recommended." *See* Exhibit 5 at p. 19.

122. <u>Third</u>, in SBA's deliberative and pre-decisional material contained in the Administrative Record, SBA concluded: "[t]his loan is being approved for forgiveness." *See* Exhibit 5 at p. 932.

123. <u>Fourth</u>, in SBA's email to lender regarding partial approval contained in the Administrative Record, SBA informed the lender:

> There are no hold flags. The borrower meets eligibility requirements . . . . Required SBA forms . . . were reviewed and determined to be in compliance. The amount of forgiveness applied for is $3,978,827 and the maximum loan calculation is $3,500,591 . . . . Additional documents were provided and reviewed that further supported the application requirements for forgiveness . . . . Partial Forgiveness in the amount of $3,500,591 is recommended.

*See* Exhibit 5 at p. 943.

124.    Yet, for some reason, these recommendations for forgiveness were not followed, and the SBA provided no rationale in the Administrative Record to explain why a FLRD was being made contrary to both the internal forgiveness recommendations for the SROTB PPP loan and the other NY OTB final loan review decision precedents. *See generally* Exhibit 5.

125.    In fact, there appears to be a massive gap in the Administrative Record as to how the forgiveness application review went from the forgoing recommendations for forgiveness, followed by a leap and complete reversal of position, to the denial of forgiveness in FLRD dated May 22, 2023. *See generally* Exhibit 5.

126.    Additionally, the Administrative Record does not reveal any explanation as to why partial forgiveness was recommended, and in slightly differing amounts (both of which are approximately 88% of the principal loan amount), and how those amounts were calculated. *See generally* Exhibit 5.

**C.    The OHA Initial Decision and OHA Final Decision opine that the SROTB PPP Application never should have been approved and that SROTB never should have received a PPP loan, but no documentation was provided to form the basis of these assertions.**

127.    The Administrative Law Judge asserted in the OHA Initial Decision and OHA Final Decision that SROTB is ineligible for a PPP loan and that "forgiveness may have been mistakenly granted to other borrowers," including "other similarly situated borrowers." Exhibit 7 and 9.

128.    However, the Administrative Record contains no documentation regarding SROTB's alleged ineligibility for a PPP loan and no documentation regarding other similarly situated borrowers allegedly being mistakenly granted forgiveness (which SROTB does not concede). *See generally* Exhibit 5.

129.    To the contrary, the Administrative Record *supports* a finding that SROTB is eligible for a PPP loan and PPP loan forgiveness, including its structure. *See* Exhibit 5 at p. 6 (stating that SROTB is eligible for both a PPP loan and PPP loan forgiveness and that SROTB has an eligible legal organization structure).

130.    The SBA essentially took the position that, not only can the Loan not be forgiven, but the Loan should not have been approved in the first place.

131.    In other words, the SBA's argument is essentially that it has itself handed out upwards of tens to hundreds of millions of dollars to borrowers that allegedly were not even eligible for a PPP loan.

132.    If true, this would constitute a nationwide failure on the part of SBA not only in the forgiveness stage for PPP loans, but also in the underwriting stage.

133.    Thus, SBA not only arbitrarily and capriciously handed out PPP loans to borrowers not eligible for such loans, but further granted corresponding forgiveness to all NY OTBs, except for SROTB.

134.    The inadequacy of the Administrative Record, due in part to OHA's denial of SROTB's objection to the Administrative Record's many deficiencies, impairs meaningful judicial review. While SROTB has, through its own diligence, secured information exposing the SBA's disparate treatment of similarly situated borrowers, comprehensive information concerning the SBA's treatment of entities comparable to SROTB that engage in legal gaming is in the sole

possession of the SBA. As a consequence of its own apparent failure to examine its treatment of those entities prior to denying loan forgiveness to SROTB on the ground that SROTB was categorically ineligible for a PPP loan, information relating to the disposition of comparable applications is not currently part of the Administrative Record. Likewise, the Administrative Record contains no information explaining the SBA's failure to accept the loan forgiveness recommendations of its own expert personnel.

135.    The SBA has benefitted from its failure to justify or explain its inconsistent treatment of similarly situated OTBs or the rejection of unanimous staff recommendations as this gap in analysis has resulted in a comparable gap in the Administrative Record. The SBA's efforts to shield itself from judicial scrutiny by failing to undertake appropriate analysis and blocking efforts to complete the record following credible claims of inconsistent treatment – assertions that, to date, the SBA has not disputed – should not be rewarded.

136.    Even if SROTB receives no other relief, this matter should be remitted to recalculate the amount due in order to excise the $1,278,108.24 in fees, penalties, and interest that were improperly imposed.

**IX.    The OHA Initial Decision and OHA Final Decision acted arbitrarily, capriciously, and erroneously because all fees, penalties, and interest on top of the principal amount of SROTB's PPP Loan should never have been assessed and should be forgiven in their entirety—a matter the OHA Initial Decision does not even address.**

137.    The Loan had a stated 1% annual interest rate.

138.    Yet, the DOT Notice stated that SROTB owed the U.S. government $5,256,935.24 on the Loan, which is $1,278,108.24 and over 30% more than the principal amount of the Loan. *See* Exhibit 11.

139.    The OHA Initial Decision and OHA Final Decision fail to recognize that SROTB's timely appeal of the FLRD should have extended the deferment period of the PPP loan until a final

decision is issued under § 134.1211, and wholly fail to address the $1,278,108.24 in fees, penalties, and interest that the SBA imposed on SROTB on top of the principal amount of the Loan. *See* Exhibits 7 and 9.

### COUNT I
### Judicial Review of Agency Action

140.    SROTB repeats and realleges each of the foregoing paragraphs as if set forth in full herein.

141.    This Court is authorized and empowered to review the FLRD, OHA Initial Decision, and OHA Final Decision for errors.

142.    The FLRD, OHA Initial Decision, and OHA Final Decision should be reversed and set aside as arbitrary, capricious, and an abuse of discretion because they are contrary to the CARES Act and the PPP.

143.    SROTB was approved for the Loan and the Loan proceeds were distributed to SROTB. Despite this, the SBA and OHA claim that SROTB is ineligible for the Loan.

144.    Additionally, while the SBA and OHA denied forgiveness to SROTB on the grounds that SROTB has an ineligible organizational structure, the SBA has forgiven the loans of all other NY OTBs with the exact same organizational structure. The FLRD, OHA Initial Decision, and OHA Final Decision ignore the fact that SBA permitted and forgave the loans of similar structured organizations, and provide no explanation as to why SROTB was the only organization out of the other OTBs that was not approved for loan forgiveness.

### COUNT II
### Declaratory and Injunctive Relief

145.    SROTB repeats and realleges each of the foregoing paragraphs as if set forth in full herein.

146.    A bona fide, justifiable controversy exists between the parties as to the correctness of the FLRD, OHA Initial Decision, and OHA Final Decision, as well as SROTB's entitlement to forgiveness of the Loan.

147.    All known and necessary interests regarding this dispute are before this Court.

148.    Specifically, SROTB, the SBA, and the Administrator are the parties that have disputed SROTB's entitlement to forgiveness of the Loan.

149.    SROTB has no adequate remedy at law.

150.    Among other things, SROTB maintains that it is entitled to a judgment: (i) declaring the SBA and OHA's application of their interim rules and their corresponding decisions denying SROTB forgiveness of the Loan contrary to law, arbitrary and capricious, and an abuse of discretion; (ii) vacating and reversing the FLRD, OHA Initial Decision, and OHA Final Decision; and (iii) enjoining and ordering Defendants to grant to SROTB full forgiveness of the Loan, along with all fees and interest imposed on SROTB in relation to the Loan.

## **PRAYER FOR RELIEF**

**WHEREFORE**, SROTB respectfully requests a judgment in favor of SROTB and against the SBA and Administrator as follows:

A.    Declaring the SBA and OHA's application of their interim rules and their corresponding decisions denying SROTB forgiveness of the Loan contrary to law, arbitrary and capricious, and an abuse of discretion;

B.    Vacating and reversing: (i) the SBA's FLRD to SROTB, which denied forgiveness of the Loan; and (ii) the OHA's decisions, including the OHA Initial Decision and the OHA Final Decision, which denied SROTB's administrative appeals;

C.      Enjoining and ordering Defendants to grant to SROTB full forgiveness of the Loan,

along with all fees and interest imposed on SROTB in relation to the Loan;

D.      Awarding SROTB attorney's fees, costs, and disbursements, with interest, to the

extent recoverable under applicable law; and

E.      Granting such other and further relief as this Court deems just and proper.


Dated: October 7, 2024                              **HARRIS BEACH PLLC**


By:      */s/ Elliot A. Hallak*
          Thomas J. Garry
          Elliot A. Hallak
          Brian D. Ginsberg
          Deana J. DiBenedetto
          333 Earle Ovington Blvd., Suite 901
          Uniondale, New York 11753
          Tel: (516) 880-8484
          tgarry@harrisbeach.com
          ehallak@harrisbeach.com
          bginsberg@harrisbeach.com
          ddibenedetto@harrisbeach.com

          *Attorneys for Plaintiff,*
          *Suffolk Regional Off Track*
          *Betting Corporation*